MICHAEL W. STEBBINS, SBN 138326
MARC G. VAN NIEKERK, SBN 201329
STEPHEN S. WU, SBN 205091
**SILICON VALLEY LAW GROUP**
1 North Market Street, Suite 200
San Jose, California 95113
Tel. (408) 573-5700
Fax (408) 573-5701
Email:  mws@svlg.com; mvn@svlg.com; ssw@svlg.com

Attorneys for Plaintiff
Gen Digital, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GEN DIGITAL, INC. (f/k/a SYMANTEC CORPORATION),<br><br>Plaintiff,<br><br>vs.<br><br>SYCOMP, A TECHNOLOGY COMPANY, INC., and NORTH AMERICAN SYSTEMS INTERNATIONAL, INC.,<br><br>Defendants. | Case No.:<br><br>**GEN DIGITAL INC'S COMPLAINT FOR BREACH OF CONTRACT** |

Gen Digital, Inc. ("Gen Digital" or "Plaintiff") alleges, for its complaint ("Complaint") against Defendants Sycomp, A Technology Company, Inc. ("Sycomp") and North American Systems International, Inc. ("NASI") (together, "Defendants"), as follows:

## NATURE OF THE COMPLAINT

1. This Complaint arises from Defendants' failure to fulfill their contractual indemnity obligations to Gen Digital, the entity formerly known as Symantec Corporation ("Symantec"), to indemnify Symentec pursuant to a Product Purchase Agreement ("PPA") between Symantec and Sycomp, and pursuant to a Service Delivery Agreement ("SDA") between Symantec and NASI.  Defendants have also failed to fulfill their contractual indemnity obligations to Gen Digital pursuant to an agreement between Symantec, on the one hand, and Defendants, in partnership and TERiX Computer Company, Inc. ("Terix"), on the other hand. to provide certain software maintenance, updating, and patching services for Symantec's computer servers (the "Solaris Patching Agreement"), which services infringed the copyrights of a third party.

2. In a separate lawsuit, Plaintiff DXC Technology Company ("DXC"), as successor-in-interest to Hewlett Packard Enterprise Services ("HPES") (itself the successor-in-interest to Electronic Data Systems Corporation ("EDS")), has alleged that Gen Digital (f/k/a Symantec), has certain contractual indemnity obligations—arising from HPES's work in connection with the same software maintenance, updating, and patching services—which remain unfulfilled.  In that lawsuit, Gen Digital alleges that, to the extent it has any indemnity obligations to DXC, those obligations should be satisfied in full by Sycomp and NASI, pursuant to valid and enforceable indemnification provisions in their agreements with Sycomp and NASI, which encompass the services provided to Symantec by the Sycomp/NASI/Terix partnership.

## PARTIES

3. Plaintiff Gen Digital is a corporation duly organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 60 E. Rio Salado Parkway, Suite 1000, Tempe, Arizona 85281.

4.      Prior to 2019, Gen Digital was formerly known as Symantec, which was a corporation duly organized and existing under the laws of the state of Delaware and with its principal place of business located at 350 Ellis Street, Mountain View, California 94043.

5.      For purposes of this lawsuit, Gen Digital is the successor-in-interest to Symantec.

6.      Defendant Sycomp is a corporation duly organized and existing under the laws of the state of California. On information and belief, Sycomp's principal place of business is located at 50 Tower Lane, Suite 1785, Foster City, California, 94404.

7.      Defendant NASI is a corporation duly organized and existing under the laws of the state of Minnesota. On information and belief, NASI's principal place of business is located at 875 Blue Gentian Road, Suite 400, Eagan, Minnesota, 55121.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

9.      Personal jurisdiction over Sycomp and NASI and venue are proper because the relevant agreements between Symantec and both Sycomp and NASI provide that any legal action arising under those agreements shall be brought in the state or federal courts located in Santa Clara County, California, that the parties consented to such personal jurisdiction and venue therein, and also because a substantial part of the events that give rise to this lawsuit occurred in Santa Clara County, California, within this District.

## GENERAL ALLEGATIONS

**A.      The Parties' Contractual Relationships**

10.     In 2007, Symantec outsourced its IT maintenance to Electronic Data Systems ("EDS"), which was acquired by Hewlett Packard ("HP") in 2008. As part of its services to Symantec, HP maintained Sun Microsystems ("Sun") branded devices running the Solaris operating system. These services included updating the software and installing software patches. Eventually, the HP entity that provided IT maintenance services to Symantec became

known as Hewlett Packard Enterprise ("HPE"), which services were eventually performed by HPE's services division ("HPES").

11. In 2008, Symantec and HPES entered into an Information Technology Services Agreement ("the ITSA Agreement"). The ITSA Agreement provided that Symantec had certain indemnity obligations to HPES.

12. In 2010, Symantec contracted with Sycomp for certain IT services, which relationship was memorialized by a Product Purchase Agreement, effective September 17, 2010 (the "PPA").

13. Section 9 of the PPA relates to Sycomp's indemnification obligations to Symantec. Section 9.2, entitled "Infringement Indemnification", provides that:

> Supplier [Sycomp] shall indemnify, hold harmless and, at Symantec's request, defend Symantec and its officers, directors, employees, partners and clients from any claims, losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and any reasonable legal fees) arising from any claims that any Product, Services and/or any Developments prepared or provided by or on behalf of Supplier hereunder infringe or misappropriate the IPR [intellectual property rights] of any third party.

(PPA, §9.2.)

14. Section 9.3 of the PPA, entitled "Indemnification Procedures", provides that:

> Symantec will promptly notify Supplier [Sycomp] of Symantec's receipt of any service of process of any such claim giving rise to Supplier's indemnification obligations (but any delay by Symantec in giving such notice shall not be deemed a breach of this Agreement and shall not excuse Supplier's obligations under this Section 9 except to the extent, if any, that Supplier is materially prejudiced by such delay). Symantec will provide Supplier with reasonable assistance and the opportunity to assume sole control over the defense and settlement. Supplier agrees that Symantec, at its own expense, shall have the right to retain its own separate counsel to participate in the defense or settlement of any claim. Symantec shall have the right to participate in the defense of any such demand, suit or cause of action concerning matters that relate to Symantec, and that such suit will not be settled without Symantec's consent, which shall not be unreasonably withheld, unless such settlement includes (i) no admission of liability, (ii) a release of all claims against Symantec, and (iii) imposes no obligations on Symantec (other than, if applicable, ceasing the use of any Infringing Product or Service). If, in Symantec's reasonable judgment, a conflict exists in the interests of Symantec and Supplier in such demand, suit or cause of action, Symantec may retain its own counsel whose reasonable fees shall be paid by Supplier.

(PPA, §9.3.)

15. In 2010, Sun was acquired by Oracle Corporation ("Oracle").

16. In 2012, following Oracle's acquisition of Sun and its Solaris workstation operating system, Symantec sought to explore less expensive IT maintenance and support options for its older Sun-branded devices.

17. At or about this time, Symantec approached Sycomp, with whom it had contracted in 2010, regarding potential IT maintenance services as an alternative to Oracle's more expensive services. In response to Symantec's inquiry, Sycomp indicated that it could do the work itself on a time and materials basis, but such an arrangement may not meet Symantec's needs. Accordingly, Sycomp introduced Symantec to NASI.

18. In mid-2012, in connection with exploring these options, Symantec and NASI executed a Service Delivery Agreement, effective August 1, 2012 (the "SDA"). The SDA was signed by Greg Springer, CFO/GM of NASI, on August 9, 2012. The SDA bears the stamped and written signature of Diana Chow on behalf of Symantec.

19. Section 1.1 of the SDA provides:

> This Agreement defines the obligations and responsibilities of NASI and [Symantec] to support [Symantec's] installed base of desktop and server computer systems.

(SDA, §1.1.)

20. Section 1.2 of the SDA provides:

> It is the understanding of both parties to this Agreement that NASI will be entering into a contractual arrangement with a third party to provide the Services specified under this Agreement (the "Services") with terms identical to this Agreement (the "Third Party"). NASI agrees that it shall be fully responsible and liable to [Symantec] for all acts, omissions and breaches by its Personnel as if the same were undertaken directly by NASI. It is the further understanding of NASI and [Symantec] that NASI's contractual relationship with any Third Party shall in no way modify, limit, or reduce NASI's obligations under this Agreement.

(SDA, §1.2.)

21. The IT maintenance services provided by NASI—through its "contractual arrangement with a third party"—included various types of hardware and software support defined in Section 2.0 of the SDA.

**2.0 Definitions.**  As used in this Agreement, the terms listed below have the following meanings:

. . .

"Operating System Software Support" means telephone technical support of one or more of the following systems: *Sun Microsystems Solaris*, International Business Machines AIX, and Hewlett Packard Company HP-UX and Hewlett Packard MPE.  *Customer shall receive* system administration support, *recommendations regarding patch and bug fix updates*, and the trouble shooting of operating system updates.

(SDA, §2.10; Emphasis added.)

"Software Support" means telephone technical support of one or more of the following systems: *Sun Microsystems Solaris*, International Business Machines AIX, and Hewlett Packard Company HP-UX and Hewlett Packard MPE.  *Customer shall receive* system administration support, *recommendations regarding patch and bug fix updates*, and the trouble shooting of operating system updates.

(SDA, §2.12; Emphasis added.)

"Telephone Technical Support" means a right to make toll-free call center telephone hotline calls that can be placed with a Third Party for access to service, support triage, dispatch service, escalation and engineering support over the telephone.  Technical support with the Third Party call center is included for customers with Critical, Critical Plus and Elite support contracts during their hours of service level contracted.

(SDA, §2.13.)  Symantec had the Critical, Critical Plus and Elite support contracts.

22.  Section 3 of the SDA provides:

**3.0 Services.**  One or more of the following Services shall be provided to Customer.  See Attachment A.

. . .

Operating System Software Support for the desktop and server computer systems identified in Attachment A.  The required level for each desktop or server system is specified in Attachment A.

(SDA, §3.12.)  Attachment A to the SDA identifies various Sun-branded Oracle servers to be serviced by NASI.

23.  Section 13.0 of the SDA, entitled "Indemnification," provides in relevant part that:

> NASI shall indemnity, hold harmless and, at [Symantec's] request, defend Customer and its officers, directors and employees from any losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and reasonable legal fees) arising from . . . (b) NASI's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law, (c) any claims that the Services infringe or misappropriate the IPR [intellectual property rights] of any third party. . . .

(SDA §13.0.)

24. Symantec's principal contact at Sycomp was Caron Rakich ("Rakich"), a Sycomp client executive. Rakich advised Symantec that Sycomp had recently become an agent for Terix and offered to facilitate a demonstration from Terix, in partnership with NASI, of Terix's tools and portal. Rakich assured Symantec that "Terix can 100% patch any Sun devices under their support up to Solaris Version 10 at this time."

25. On February 25, 2013, Rakich sent an email to Lee Buckland ("Buckland"), a service manager at Symantec. Buckland's responsibilities included managing Symantec's outsourced IT providers and coordinating ongoing maintenance. In her email, Rakich wrote she was not surprised that Symantec was validating and questioning their Solaris support services. After noting that Sycomp had been through a similar vetting process with other clients, she recommended that Symantec participate in a conference call to address the issues and to explain how Terix provides support. Rakich said that she felt this would be the correct next step in light of Symantec's concerns.

26. Symantec agreed to this proposal and, on March 12, 2013, Buckland and Paul DeBacker ("DeBacker"), a Symantec IP Vendor Manager, participated in a call with a Terix representative and EVP, Larry Quinn ("Quinn"), to discuss Terix's purported license rights to provide the services sought by Symantec and offered by the Sycomp/NASI/Terix partnership. In that call, Quinn emphasized that the Sycomp/NASI/Terix partnership had the right to obtain the necessary patches and updates without infringing anyone else's—namely, Oracle's—intellectual property rights.

27. After the discussion, Quinn sent Buckland and DeBacker an email thanking them for participating in the call and stating: "I will be completing the transcription and

attachments to have them sent to you on (*sic*) email tomorrow morning.  NASI/TERiX appreciate your considering our team for support."

28. True to his word, on March 13, 2013, Quinn sent Buckland and DeBacker an email to which he attached a twenty-page document entitled "LICENCE/RIGHTS DISCUSSION," which was a rough transcript of the previous day's call combined with preprepared content explaining how NASI/Terix were able to legally provide software patches for Solaris systems that were outside of the Oracle maintenance agreement.  Quinn ended his email stating "Thank you again for your consideration of NASI/TERiX for additions (*sic*) support scope, and we hope that the process, while lengthy, was valuable for Symantec." Sycomp and NASI never repudiated, contradicted, or even questioned Quinn's assertions and proceeded to work with Terix to provide the services.

29. On March 18, 2013, "Sycomp, in partnership with Terix and NASI" sent Symantec a quotation for renewal of maintenance for assorted server and storage equipment for 4/1/14-3/31/15 in the amount of $1,610,974.24.  The quotation explicitly states: "Terms subject to Symantec/NASI/Sycomp Master Agreement."

30. On March 19, 2013, Rakich sent Symantec an email entitled "Symantec Maintenance," which attached the SDA between NASI and Symantec.  In this email, Rakich stated "[a]attached is the fully executed terms and conditions which [Sycomp is] able to operate under with NASI/Terix."

31. On March 22, 2013, Quinn sent Buckland and DeBacker another email in which he stated, *inter alia*, "Hope you are having a good week.  Some of our team (NASI and TERiX) had asked that I provide some information on Solaris 8 since Symantec is using this version as well."

32. On March 25, 2013, "Sycomp, in partnership with Terix and NASI" sent Symantec a revised quotation for renewal of maintenance for assorted server and storage equipment for 4/1/14-3/31/15 in the amount of $1,543,934.24.  The quotation again explicitly states: "Terms subject to Symantec/NASI/Sycomp Master Agreement."

33. On April 3, 2013, Symantec issued a purchase order to Sycomp in the amount of

$1,093,118.43.  The same day, Symantec issued a revised purchase order in the amount of $1,615,397.58.

34. On April 9, 2013, Sycomp, NASI and Terix made a PowerPoint presentation to Symantec.  In that presentation, the three companies again represented themselves as "partners" and Sycomp and NASI also indicated they were Terix resellers.  Sycomp and NASI specifically represented to Symantec that they were Terix resellers with "[o]ver 10 years of partnership" and that Sycomp, NASI and Terix had "[h]undreds of clients."  Terix required its resellers (including NASI and, on information and belief, Sycomp) to execute an agreement (the "Reseller Agreement") in order to resell Terix's services.  The Reseller Agreements provide in part that, "Terix and Reseller enter into this Agreement *for the purposes of Reseller offering TERiX Services to Resellers' customers*."  (Emphasis in original.)  The Reseller Agreements also provide that "Reseller will receive a commission of 10% (unless negotiated otherwise prior to submission to the customer) on TERiX services sold by the Reseller."

35. On April 10, 2013, a Terix representative sent an email to Symantec, Sycomp and NASI representatives entitled "Terix Meeting Follow Up."  The email further confirmed the interconnected relationship by beginning with, "Thank you again from Sycomp, NASI and Terix for the new business."

36. Thus, by April 10, 2023, Symantec, on the one hand, and Sycomp, NASI and Terix, on the other hand, had formed an agreement that was partly oral and partly written, in which Sycomp/NASI/Terix would provide software patches to be installed on Symantec's Solaris systems (the "Solaris Patching Agreement").  This agreement was explicitly "subject to Symantec/NASI/Sycomp Master Agreement."  The expression "Master Agreement" is a reference to the PPA with respect to Sycomp, and the SDA with respect to NASI.  Thus, the Solaris Patching Agreement necessarily included the above-quoted indemnification obligations Sycomp and NASI had to Symantec in the PPA and SDA, respectively.

**B.     Sycomp/NASI Make Assurances Regarding Their Indemnity Obligations**

37. In the first quarter of 2013, HPES expressed concerns about the legality of installing patches provided by Terix and there were numerous communications between and

among Symantec, Sycomp, NASI and Terix personnel regarding the issue.

38. Thus, on April 17, 2023, DeBacker sent Rakich another email asking if she could "provide me with the Terms and Conditions that we are operating under with the TERiX contract? I'm especially interested in the indemnification clauses."

39. On April 18, 2013, Rakich responded stating, "<u>NASI agreement [the PPA] attached. Also I have master terms with them so they will hold me to that</u>." (Emphasis added.) That same day, Rakich forwarded the email string to Sycomp/NASI/Terix representatives noting, "First question from Symantec regarding the 'relationship' . . . I'm surprised it hasn't come up sooner. The question is around indemnification. <u>If for example Oracle deciding [sic] to sue Symantec saying you can't have those patches etc. and are in violation. Who's covering that? Does the NASI agreement attached</u>?" (Emphasis added.)

40. Later that same day, an email from Rakich to Symantec stated, ". . . <u>NASI/Terix agent [sic] covers indemnification. See Section 13 [of the SDA]. If you have any concerns that you want to address. See also Sycomp terms section 9.1 [of the PPA]</u>."

41. On May 2, 2013, Sycomp issued another invoice to Symantec in the amount of $522,279.16, and on May 9, 2013, Symantec issued a corresponding purchase order.

42. On July 19, 2013, Oracle commenced an action against Terix and other third parties in U.S. District Court, Northern District of California, for alleged unauthorized use of Oracle/Sun software and/or software support materials, including Solaris operating system patches, entitled *Oracle America, Inc. v. Terix Computer Company, et al.,* Case No. 5:13-cv-03385-PSG (the "*Oracle v. Terix* Lawsuit"). Oracle alleged that Terix had obtained such patches fraudulently and without authorization and used them for customer installations.

43. On August 2, 2013, a DeBacker sent Rakich an email, which stated, "[i]n light of the lawsuit filed by Oracle against Terix, we'd like to have an informal discussion with Terix about how they view the situation and discuss any risks Symantec may be facing." He asked Rakich to "set something up with them," indicating that he and Buckland would attend. Rakich responded that same day stating "Sure. They already actually mentioned this to me. I'll set up a call for Monday." In that call, Sycomp/NASI/Terix again reassured Symantec that they were

authorized to install the patches.

44. On January 31, 2014, Eric Hawkins ("Hawkins") of Terix sent an email to Caulfield (of NASI), Rakich (of Sycomp), DeBacker, Buckland, John Stone ("Stone") (all of Symantec), as well as others, which was copied to "channel." The subject line stated "Terix Support Renewal" and attached two files for the call to be held that day to discuss the upcoming renewal of Sycomp/NASI/Terix support services for Symantec. The attachments were a PowerPoint "Service Review and Open Items" and a quote for the services in Excel. The following was the title slide from the PowerPoint.



45. On March 18, 2014, Sycomp "in partnership with Terix/NASI" issued a quote for maintenance renewal, again "subject to Symantec/NASI/Sycomp Master Agreement." This was circulated via email between Symantec and Sycomp/NASI/Terix representatives.

46. On March 25, 2014, Rakich circulated an "updated Symantec renewal quote DRAFT" to HPES and NASI representatives. A copy of the attachment, containing the Sycomp/NASI/Terix partners' logo, is reproduced below. The quotation again explicitly states: "Terms subject to Symantec/NASI/Sycomp Master Agreement."





47. On June 15, 2015, Oracle and Terix entered into a stipulated judgment pursuant to which Terix was to pay Oracle $57,723,000 for copyright infringement, fraud, violations of the Computer Fraud and Abuse Act, false advertising under the Lanham Act, breach of contract, intentional interference with prospective economic relations and unfair competition. In addition, Terix and its officers, agents and employees were enjoined from, *inter alia*, giving, selling, or otherwise providing to anyone Oracle/Sun software and/or software support materials, including any updates, bug fixes, media kits, software support materials or software patches.

48. In 2018, Quinn and three other Terix executives were convicted of fraudulently obtaining more than $10 million worth of intellectual property from Oracle and using the fraudulently obtained intellectual property, including operating system patches and updates, to

support its customers, including Symantec.

C. **The Demands for Indemnification and the *Oracle v. HPES* Lawsuit**

49. On July 17, 2015, HPES notified Symantec of Oracle's intent to file suit against HPES in relation to Terix's provision of Oracle/Sun software and support services to HPES customers, including Symantec. Oracle alleged, *inter alia*, that Terix provided Solaris patches to Symantec for older Solaris servers, which HPES then ultimately installed for Symantec, as well as several other customers, and that such conduct constituted copyright infringement.

50. On August 21, 2015, Symantec notified Sycomp and NASI of HPES's indemnity demand and, in turn, requested indemnification from Sycomp/NASI pursuant to the indemnification provisions of the PPA (between Symantec and Sycomp) and the SDA (between Symantec and NASI).

51. On March 13, 2016, Oracle filed suit against HPES in the U.S. District Court, Northern District of California, captioned *Oracle America, Inc., et al. v. Hewlett Packard Enterprise Company,* Case No. 3:16-cv-01393-JST (the "*Oracle v. HPES* Lawsuit"), which included claims for (1) copyright infringement; (2) interference with contract; (3) intentional interference with prospective economic relations; and (4) unfair competition.

52. Thereafter, counsel for Symantec/Gen Digital had multiple communications with counsel for Sycomp and NASI regarding its claims for indemnification, as well as the status of the *Oracle v. HPES* Lawsuit.

53. Meanwhile, in April 2017, HPES spun off its Enterprise Services business, which was merged with Computer Services Corporation ("CSC"), to form DXC. Thereafter, HPES and DXC agreed to jointly retain counsel to defend the *Oracle v. HPES* Lawsuit.

54. In May 2022, the *Oracle v. HPE* Lawsuit went to trial. Oracle argued, *inter alia*, that HPES's installation of Terix-obtained Solaris Updates on Symantec servers and those of other HPES customers infringed Oracle's copyrights.

55. On June 14, 2022, a jury rendered a verdict that HPES directly and vicariously infringed Oracle's copyrights and intentionally interfered with Oracle's contractual relationships and prospective economic relationships, awarding Oracle $30 million in damages. Oracle

1  thereafter moved the Court to recover over $27 million in legal fees and pre-judgment interest.

2      56.    On January 17, 2023, Oracle and HPES reported to the Court that they had entered into a confidential settlement agreement and stipulated that the action should be dismissed with prejudice, which the Court ordered.

    57.    In November 2022, DXC, the successor-in-interest to HPES's indemnity rights against Symantec, requested that Gen Digital fulfill Symantec's indemnity obligations under the ITSA Agreement.

    58.    On December 23, 2023, counsel for Gen Digital notified counsel for Sycomp and NASI of DXC's renewed indemnity demand and repeated its demand that Sycomp and NASI fulfill their indemnification obligations to Gen Digital.  Thereafter, Sycomp and NASI both failed and refused to fulfill their indemnification obligations to Gen Digital under the PPA, the SDA and the Solaris Patching Agreement.

    59.    On September 19, 2023, DXC filed suit against Gen Digital in the U.S. District Court, Northern District of California, captioned *DXC Technology Company v. Gen Digital, Inc.*, Case No. 23-cv-04818-EJD ("the *DXC v. Gen Digital* Lawsuit").

    60.    On October 11, 2023, Gen Digital filed an answer in the *DXC v. Gen Digital* Lawsuit, as well as a Third-Party Complaint against Sycomp and NASI for breach of contract, equitable indemnity and declaratory relief ("the Third-Party Complaint").

    61.    On June 7, 2024, the Court granted DXC's motion to sever the Third-Party Complaint from the *DXC v. Gen Digital* Lawsuit and granted Gen Digital leave to file this stand-alone complaint against Sycomp and NASI.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT (the PPA)**
**(Against Sycomp)**

    62.    Gen Digital realleges and incorporates the previous paragraphs of this Complaint as though fully set forth herein.

    63.    Symantec and Sycomp entered into a valid contract (the PPA) for the provision of certain services.  The PPA included an agreement from Sycomp to indemnify Symantec and

its successor "from any claims, losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and any reasonable legal fees) arising from any claims that and Product, Services and/or any Developments prepared or provided by or on behalf of Supplier hereunder infringe or misappropriate the IPR [intellectual property rights] of any third party." (*See* PPA, §9.2.)

64. Sycomp also confirmed that its indemnity obligations extended to the services Sycomp provided to Symantec in conjunction with NASI and Terix as described herein.

65. Gen Digital has performed all of its obligations under the PPA, save and except those obligations excused by Sycomp's breach.

66. Symantec (n/k/a Gen Digital) complied with the Indemnification Procedures provided in Section 9.3 of the PPA by providing Sycomp with notice of the claims that gave rise to the *Oracle v. HPES* Lawsuit, HPES's indemnity demand to Symantec and Sycomp's obligation to provide indemnification as promptly as practicable.

67. Sycomp acknowledged receipt of the request for indemnification from Symantec (n/k/a Gen Digital) pursuant to Section 9.3 of the PPA and opted not to exercise its right to assume control of the defense and settlement of the claim, thus allowing Symantec to handle the claim in such manner as it may deem appropriate.

68. Despite Sycomp's uncontested obligation under the terms of the PPA to indemnify Symantec for losses resulting from and arising out of the *Oracle v. HPES* Lawsuit and HPES's indemnity demand to Gen Digital, Sycomp has failed to satisfy its obligations to indemnify Gen Digital (f/k/a Symantec).

69. Gen Digital has incurred losses and exposure, and continues to incur expenses and costs related to loses and exposure, in excess of $30 million as a result of Sycomp's breaches of the PPA and failure to satisfy its indemnification obligations under the terms of the PPA, including the expenses and costs Gen Digital is incurring in bringing this Complaint, in an amount to be proven at trial.

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT (the SDA)**
**(Against NASI)**

70. Gen Digital realleges and incorporates the previous paragraphs of this Complaint as though fully set forth herein.

71. Symantec and NASI entered into a valid contract (the SDA) for the provision of certain services. The SDA included an agreement from NASI to indemnify Symantec and its successor "from any losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and reasonable legal fees) arising from . . . (b) NASI's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law, (c) any claims that the Services infringe or misappropriate the IPR [intellectual property rights] of any third party. . . ." (See SDA, §13.0.)

72. NASI also confirmed that its indemnity obligations extended to the services NASI provided to Symantec in conjunction with Sycomp and Terix as described herein.

73. Gen Digital has performed all of its obligations under the SDA, save and except those obligations excused by NASI's breach.

74. Symantec (n/k/a/ Gen Digital) complied with its obligations under the terms of the SDA, including providing NASI with prompt notice of the claims that gave rise to the *Oracle v. HPES* Lawsuit, HPES's indemnity demand to Symantec and NASI's obligation to provide indemnification under Section 13.0 of the SDA as promptly as practicable.

75. NASI acknowledged receipt of the request for indemnification from Symantec (n/k/a Gen Digital) and opted not to exercise its right to assume control of the defense and settlement of the claim, thus allowing Symantec to handle the claim in such manner as it may deem appropriate.

76. Despite NASI's uncontested obligation under the terms of the SDA to indemnify Symantec for losses resulting from and arising out of the *Oracle v. HPES* Lawsuit and HPES's indemnity demand to Symantec, NASI has failed to satisfy its obligations to indemnify Gen Digital.

77. Gen Digital has incurred losses and exposure, and continues to incur expenses and costs related to loses and exposure, in excess of $30 million as a result of NASI's breaches and of the SDA and failure to satisfy its indemnification obligations under the terms of the SDA, including the expenses and costs Gen Digital is incurring in bringing this Complaint, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT (the Solaris Patching Agreement)
### (Against Sycomp and NASI)

78. Gen Digital realleges and incorporates the previous paragraphs of this Complaint as though fully set forth herein.

79. As set forth above, Gen Digital was formerly known as Symantec, which entered into the partly oral and partly written Solaris Patching Agreement with Defendants, acting in concert as partners, for the provision of certain IT maintenance services and software to be installed by HPES (DXC's predecessor-in-interest), which services and installation ultimately became the basis for claims in the *Oracle v. HPES* Lawsuit.

80. The Solaris Patching Agreement incorporated the PPA which included an agreement from Sycomp to indemnify Symantec and its successor "from any claims, losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and any reasonable legal fees) arising from any claims that and Product, Services and/or any Developments prepared or provided by or on behalf of Supplier hereunder infringe or misappropriate the IPR [intellectual property rights] of any third party." (*See* PPA, §9.2.)

81. The Solaris Patching Agreement incorporated the SDA which included an agreement from NASI to indemnify Symantec and its successor "from any losses, liabilities, damages, demands, suits, causes of action, judgments, costs or expenses (including court costs and reasonable legal fees) arising from . . . (b) NASI's breach of warranty, negligence, willful misconduct, fraud, misrepresentation, or violation of law, (c) any claims that the Services infringe or misappropriate the IPR [intellectual property rights] of any third party. . . ." (See SDA, §13.0.)

82. Gen Digital has performed all of its obligations under the Solaris Patching

Agreement, save and except those obligations excused by Defendants' breach.

83. Symantec engaged with Defendants for the provision of such services and software, in part, based on representations and assurances provided by Defendants or their agents concerning Terix's authority to obtain Solaris patches and concerning Defendants' indemnity obligations to Symantec. Thus, in the event that Gen Digital suffers any liability pursuant to the allegations in the *DXC v. Gen Digital* Lawsuit, Gen Digital is entitled to full indemnity from Defendants for all liability, losses and costs incurred in connection with the allegations in that lawsuit.

84. Symantec (n/k/a Gen Digital) complied with the Indemnification Procedures provided in Section 9.3 of the PPA, which were incorporated into the Solaris Patching Agreement, by providing Sycomp with notice of the claims that gave rise to the *Oracle v. HPES* Lawsuit, HPES's indemnity demand to Symantec and Sycomp's obligation to provide indemnification as promptly as practicable.

85. Sycomp acknowledged receipt of the request for indemnification from Symantec (n/k/a Gen Digital) pursuant to Section 9.3 of the PPA and opted not to exercise its right to assume control of the defense and settlement of the claim, thus allowing Symantec to handle the claim in such manner as it may deem appropriate.

86. Despite Sycomp's uncontested obligation under the terms of the PPA, which were incorporated into the Solaris Patching Agreement, to indemnify Symantec for losses resulting from and arising out of the *Oracle v. HPES* Lawsuit and HPES's indemnity demand to Gen Digital, Sycomp has failed to satisfy its obligations to indemnify Gen Digital (f/k/a Symantec).

87. Symantec (n/k/a/ Gen Digital) complied with its obligations under the terms of the SDA, including providing NASI with prompt notice of the claims that gave rise to the *Oracle v. HPES* Lawsuit, HPES's indemnity demand to Symantec and NASI's obligation to provide indemnification under Section 13.0 of the SDA, which was incorporated into the Solaris Patching Agreement, as promptly as practicable.

88. NASI acknowledged receipt of the request for indemnification from Symantec

(n/k/a Gen Digital) and opted not to exercise its right to assume control of the defense and settlement of the claim, thus allowing Symantec to handle the claim in such manner as it may deem appropriate.

89. Despite NASI's uncontested obligation under the terms of the SDA, which was incorporated into the Solaris Patching Agreement, to indemnify Symantec for losses resulting from and arising out of the *Oracle v. HPES* Lawsuit and HPES's indemnity demand to Symantec, NASI has failed to satisfy its obligations to indemnify Gen Digital.

90. Gen Digital has incurred losses and exposure, and continues to incur expenses and costs related to loses and exposure, in excess of $30 million as a result of Defendants' conduct, including the expenses and costs Gen Digital is incurring in bringing this Complaint, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. For compensatory damages according to proof at trial;
2. For reasonable costs and attorneys' fees for Plaintiff and against Defendants on the Complaint;
3. For interest at the legal rate on any damages awarded to Plaintiff; and
4. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: July 8, 2024         SILICON VALLEY LAW GROUP

By:   */s/ Michael W. Stebbins*
      Michael W. Stebbins
      Marc G. van Niekerk
      Stephen S. Wu
      Attorneys for Plaintiff
      GEN DIGITAL, INC.